923 F.2d 839
 Unpublished Disposition
NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
James M. LEBLANC, Plaintiff, Appellant,
v.
Ian TINK, ET AL., Defendants, Appellees.
 No. 90-1126.
 United States Court of Appeals, First Circuit.
 Oct. 9, 1990.
 
 Appeal from the United States District Court for the District of Massachusetts; Walter Jay Skinner, District Judge.
 James M. LeBlanc, on brief pro se.
 James M. Shannon, Attorney General and Karen Cheeks-Lomax, Assistant Attorney General, on brief, for appellees Ian Tink, Edward Murphy, Patricia Cross and Janet Dickerson.
 Nancy Ankers White, Special Assistant Attorney General and Veronica M. Madden, on Motion For Summary Disposition for Department of Correction defendants-appellees.
 Charles H. Yelen, Alice Olsen and Morrison, Mahoney & Miller on brief, for appellees Kevork Vorperian, M.D., and Goldberg Medical Associates, Inc.
 D.Mass.
 AFFIRMED.
 Before BREYER, Chief Judge, and SELYA and CYR, Circuit Judges.
 PER CURIAM.
 
 
 1
 The appellant, James M. LeBlanc, appeals a district court judgment dismissing his complaint for failure to state a claim and for lack of subject matter jurisdiction. We affirm.
 
 
 2
 The appellant is committed to the Massachusetts Treatment Center for Sexually Dangerous Persons at Bridgewater. According to his complaint, on Friday, September 9, 1988, the appellant punched his "wall cabinet unit" in his room, "in a fit of anger." He went to the Treatment Center's Health Services Unit (HSU), said he was in pain and thought he had broken his hand, and asked for an ice bag. The nurse (Susan) looked at his hand and gave him an ice bag. He returned to his room. After approximately one-half hour, the pain and swelling had worsened. He summoned an officer and asked to be taken back to the HSU.[1] He was escorted to the HSU approximately 10-15 minutes later.
 
 
 3
 Once back at the HSU, he spoke to a different nurse (Barbara), who then called a doctor. The doctor prescribed 600 mgs. of Motrin and instructed the nurse to make an appointment for x-rays for the next day. He was given 600 mgs. of Motrin and escorted back to his room. The next day, Saturday, September 10, 1988, he again received Motrin and went to Bridgewater State Hospital for x-rays. When he returned to the Treatment Center, he saw Doctor "John Doe." Dr. John Doe confirmed that his hand was broken. The doctor then made a phone call and told the appellant that he could not go to the hospital until Monday. The doctor continued the Motrin and refused the appellant's request for a stronger medication. Nurse "Barbara or Janet" then made a splint with three tongue depressors and an ace bandage. He received Motrin all weekend, but the pain was unalleviated.
 
 
 4
 On Monday, September 12, 1988, the appellant went to the visiting room area "to be shaken down" for the trip to the Shattuck Hospital. The State Transportation Officer "John Doe" told the appellant to remove everything from his pockets. The appellant removed a paperback book, hairbrush, and two cough drops. After a strip search, the appellant reached for his pocket items, but Officer Doe told him that he was not allowed to take them with him. The appellant said that he could do without the book and hairbrush,
 
 
 5
 but that I needed the cough drops because I have hay fever and that the cough drops help my throat from acting up, causing me to sneeze. The officer stated "that I couldn't take anything", I again tried to explain to the officer why I needed them. He then asked me if I was refusing the trip to the Shattuck. Of course I told him no! But that I needed the cough drops. He then picked up his stuff and walked out to the front lobby. He talked briefly with the officer in the trap. And then just walked straight out the front door. I asked the officer in the trap, what was the problem? He said "that the officer said that I refused." I never did no such thing.
 
 
 6
 The appellant got "very agiatated (sic)" and spoke to several people, who were either "antagonistic" or otherwise unhelpful in his "dilemma." Finally, he spoke to a "Michael Stevens" (apparently an employee of the Department of Mental Health in the "Therapy Suite"), who said that it was too late to get transportation to the hospital that day, but that "I should be going tomorrow." Michael Stevens also told the appellant that he looked into the policies concerning the transportation of patients to the hospital and told appellant, "There is no such policy that he could find saying that I couldn't take cough drops with me to the Shattuck."
 
 
 7
 He was not taken to the hospital the next day, Tuesday, September 13, 1988. He again spoke to Michael Stevens, who said that he was still trying "to get me in to see a doctor for treatment." He also called his attorney. Eventually that day, he was given an appointment date of September 26, 1988. Nurse Janet had made the appointment, saying that it was the earliest possible appointment. The appellant "reminded" her that he had a broken hand and she said that she "didn't think it was that serious," and "well that's too bad you should have gone Monday." He spoke to Michael Stevens again, as well as his attorney. That night he was given an appointment slip with the date of Thursday, September 15, 1988.
 
 
 8
 He went to the Shattuck Hospital on Thursday, September 15, 1988.[2] More x-rays were taken. His hand was reset twice by Dr. Barrett and a cast was put on. On September 22nd, he went back to the hospital; more x-rays were taken; the cast was removed; his hand was reset and another cast put on. That night, back at the Treatment Center, the pain was very severe and he was given some medication, which was "slightly better" than the Motrin. The cast was removed on October 13, 1988. He went back to the hospital on October 31, 1988 because "my hand was still a little swollen and it didn't look or feel right." A doctor (not Dr. Barrett) said that it needed time to heal.
 
 
 9
 The appellant filed this lawsuit on December 21, 1988. He named as defendants, various officers and/or employees of the Department of Mental Health and the Department of Corrections.[3] He also named as defendants, "Dr. John Doe ?, And whomever he's employed by, Is the Doctor who regularly visits the Treatment Center," Pat Cross, Head Nurse at the Treatment Center, and her staff, and "Janet ??, Nurse" at the Treatment Center.
 
 
 10
 He alleged that Officer John Doe refused to take him to the Shattuck Hospital for treatment of his hand. He stated that Officer Doe is an agent of John Ober, who, appellant claimed, in turn, is an agent of Michael V. Fair. Ober and Fair are not otherwise mentioned in the complaint. Thomas DaSilva, it was alleged, knowing of the appellant's broken hand, "did nothing in his power" to provide transportation to any hospital, saying that appellant had to go with a State Transportation officer. The appellant alleged that Ian Tink refused him transportation to any hospital for the entire 7 day period. Ian Tink is alleged to be an agent of Edward Murphy. Murphy is not otherwise mentioned in the complaint. Doctor John Doe, with knowledge that appellant's hand was broken, allegedly, knowingly and deliberately let the appellant suffer with pain from Friday, September 9, 1988 to Monday, September 12, 1988. Further, the appellant claimed, Doctor Doe denied him adequate medication and caused him irreparable damage (not otherwise defined) by deliberately causing delay in treating his broken hand. Pat Cross and the hospital staff allegedly caused the appellant pain, suffering, and irreparable damage by complying with the doctor's orders. "Janet", it was alleged, tried to deny the appellant emergency medical care and caused him great emotional stress by making his appointment at the hospital for thirteen days hence.
 
 
 11
 The appellant alleged a denial of medical treatment, in violation of the Eighth and Fourteenth Amendments,[4] and sought declaratory relief, compensatory and punitive damages, from "each and every defendant who is found to be negligent in their official duties." Although Dr. John Doe was not further identified in the complaint, a summons and the complaint were served on a Dr. Kevork Vorperian and on Goldberg Medical Associates, Inc. (GMA). GMA supplies medical care to inmates at the Treatment Center and Dr. Vorperian was an employee of GMA in September 1988. Vorperian and GMA moved to dismiss. The remaining defendants[5] moved to dismiss, as well. As noted at the outset, the district court granted dismissal and this appeal followed.
 
 I.
 
 12
 The Supreme Court has enunciated the standard to be applied to Sec. 1983 actions which allege medical treatment in derogation of the Eighth Amendment. "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' [citation omitted], proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 104 (1976). This deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Id. at 104-05 (footnotes omitted). Conversely,
 
 
 13
 a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.
 
 
 14
 Id. at 106 (footnote omitted).
 
 
 15
 Initially, we note that some of the acts ascribed to certain of the defendants are alleged in parts of the complaints in the following manner: for example, "knowingly and deliberatly [sic] let plaintiff suffer with pain," "knowing I cannot receive or see another doctor for the entire weekend, was a deliberate act of cruel and unusual punishment in denying plaintiff with adequate medication to eleaveate [sic] the pain that the plaintiff was suffering," and "deliberatly [sic] causing delay in treating broken hand." In his request for relief, appellant described Nurse Janet's act of "tr[ying] to delay plaintiffs [sic] emergency medical needs, by making an appointment for the plaintiff at the Shattuck Hospital thirteen days after I was refused transportation to the Shattuck on Monday," as "deliberate and malicious" and sought punitive damages. Apart from this, however, he characterized the acts for which he sought a remedy as "negligent." Mere negligence is insufficient evidence of deliberate indifference. The appellant, now aware of his complaint's perceived shortcomings, argues on appeal that his claim is that of deliberate indifference. Even attributing appellant's use of the term "negligent" to unartful pleading and construing his complaint "liberally", Estelle v. Gamble, 429 U.S. at 106, the acts and/or omissions alleged in this complaint do not rise to the level of "deliberate indifference."
 
 
 16
 The appellant was seen at the HSU by medical personnel immediately after he sustained his self-inflicted injury. That evening, he was treated with ice and, thereafter, was prescribed medication. X-rays were taken the next day. His grievance essentially is that "Dr. John Doe," once aware that appellant's hand was broken, did not order his immediate transportation to a hospital for treatment and refused his request for medication stronger than Motrin. What we have stated on a past occasion, when presented with a claim that focuses on the quality and source of the medical treatment received, applies here as well. "Rather than evidencing 'deliberate indifference' to his medical needs on the part of the prison medical staff, these allegations simply reflect a disagreement on the appropriate course of treatment. Such a dispute with an exercise of professional judgment may present a colorable claim of negligence, but it falls short of alleging a constitutional violation." Ferranti v. Moran, 618 F.2d 888, 891 (1st Cir.1980); see also Layne v. Vinzant, 657 F.2d 468, 474 (1st Cir.1981) (" '[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law' ", quoting Westlake v. Lucas, 537 F.2d 857, 860 n. 5 (6th Cir.1976)).
 
 
 17
 The appellant's complaint with respect to State Transportation Officer John Doe fares no better. The appellant characterizes that officer's failure to transport him to the Shattuck Hospital, as anticipated, on Monday, September 12, 1988, as a "refusal" of transportation for medical treatment. Even accepting that characterization, that refusal, in light of the facts as stated by appellant, does not suggest deliberate indifference or an act or omission " 'repugnant to the conscience of mankind.' " Estelle v. Gamble, 429 U.S. at 106 (quoting Palko v. Connecticut, 302 U.S. 319, 323 (1937)). Although the appellant claims that he was not refusing the trip to the Shattuck, it is evident from appellant's own description of the incident that he was insisting that he be transported on his own terms, i.e., he wanted to carry his cough drops with him. The appellant's insistence on setting his own conditions for transportation cannot be transformed justifiably into an actionable claim alleging the officer's deliberate indifference to appellant's medical needs.[6] That he subsequently was not transported to the Shattuck Hospital for three more days should not be divorced from the fact that the appellant was given the opportunity for transportation on Monday. In light of that opportunity, not taken, and in view of the fact that, in the meantime, he continued to receive medication, and medical personnel continued to be available to him in the HSU, these additional three days were not a substantial delay sufficient to make out an Eighth Amendment violation.
 
 
 18
 Likewise, appellant's complaints about "Nurse Janet," i.e., that she originally booked an appointment for September 26th, thirteen days hence, and his suggestions that she seemed callous about his injury by her statements that she "didn't think it was that serious" and "well that's too bad you should have gone Monday" do not, on these facts, rise to an Eighth Amendment violation. See Sires v. Berman, 834 F.2d 9, 13 (1st Cir.1987) ("a case of a petty squabble with an overworked, or even rude, nurse ... [is] certainly not an indifference that can offend 'evolving standards of decency' ", quoting Estelle v. Gamble, 429 U.S. at 106). We also note that when appellant complained about the appointment date he soon received a more favorable date. Rather than deliberate indifference to his medical needs, this is some evidence that defendants were attempting to accommodate appellant.
 
 
 19
 The proper disposition of the claims against the remaining defendants necessarily follows. There being no Eighth Amendment violation either in Dr. Doe's failure to order appellant's immediate transportation to a hospital or in the three day delay after the aborted Monday trip, there is no actionable claim against either DaSilva or Tink, even assuming, as alleged, that either or both had authority to provide such transportation. Ober is mentioned in the complaint only insofar as he is alleged to be a principal of State Transportation Officer John Doe, Fair only insofar as he is alleged to be a principal of Ober, and Murphy only insofar as he is alleged to be a principal of Tink. Apart from the lack of any actionable claims against their agents, even if there were, "there is no respondeat superior liability under section 1983." Layne v. Vinzant, 657 F.2d at 471. Finally, with respect to the claim against Pat Cross, the head nurse, and the hospital staff, the short answer is that, there being no actionable claim against Dr. Doe, there is no actionable claim against them for complying with the doctor's orders.
 
 II.
 
 20
 The appellant raises some additional complaints about the manner in which his action was disposed of in the district court. He states that dismissal should not have been allowed because he had only received DaSilva and Fair's motion to dismiss. Dr. Vorperian and GMA point out, however, that he must have also received their motion to dismiss, filed on April 17, 1989. That motion was the first filing in which the name of their attorney, Stephen P. Harten, appeared. Their previous motion for an enlargement of time had been filed by another of their attorneys. On May 5, 1989, shortly after the motion to dismiss was filed, the appellant moved for appointment of counsel in the district court and indicated on that motion that he had sent a copy to Stephen P. Harten. Obviously, he could only have known to do so if he had received the motion to dismiss with Mr. Harten's name. We conclude, therefore, that appellant, in fact, received this motion to dismiss. The remaining defendants, the Department of Mental Health officials and employees, moved to dismiss on May 8, 1989, with a certification that all parties were served. We need not definitively resolve whether or not the appellant actually received this motion, however. Even if the Department of Mental Health defendants had not filed their motion to dismiss,[7] the district court, having before it motions to dismiss from other defendants raising the same issue, properly could consider the sufficiency of the complaint as against all defendants. Diaz v. Stathis, 440 F.Supp. 634 (D.Mass.1977), aff'd, 576 F.2d 9 (1st Cir.1978). The appellant was not prejudiced by any alleged failure to receive the motion to dismiss from the Department of Mental Health defendants. From the motions to dismiss filed by the other defendants, in particular, the Department of Corrections defendants, of which the appellant undoubtedly was aware, he was on notice of the specific deficiency which allegedly made his complaint vulnerable to attack, i.e., failure to state a claim which rises to the level of a constitutional violation. Yet the appellant filed no opposition to those motions.[8] We, therefore, reject appellant's claim that the complaint should not have been dismissed because he did not receive all of the motions to dismiss.
 
 
 21
 The appellant also contends that his request for appointment of counsel should have been granted. We find no abuse of discretion in the district court's denial of this request. See Cookish v. Cunningham, 787 F.2d 1, 2 (1st Cir.1986). No additional factual investigation, of any import, would seem necessary to support appellant's claim, id. at 3; that is, all the relevant facts would seem to have been within the appellant's ken at the time that he filed his complaint. In other words, the complaint was deficient, not because of the absence of relevant facts which further investigation would have revealed.[9] Rather, the appellant was aware of, and stated, all relevant facts; but even assuming these facts to be true, as we must on a motion to dismiss, and construing this pro se complaint liberally, the sum of these facts, nonetheless, just did not state a cognizable claim. The factual and legal issues were not particularly complex, id., and, as remarked by the district court, the appellant presented his allegations in a clear manner in the papers filed, id.
 
 
 22
 The appellant also complains that he was without his legal papers for some time.[10] We gave the appellant extensions of time in which to file his appellate brief. His legal material subsequently was returned to him and he duly filed his brief. We, therefore, deem his motions relating to this issue to be moot. We decline to address any claim with respect to access to any legal papers other than those related to this appeal.
 
 
 23
 The judgment of the district court is affirmed.
 
 
 24
 The motions with respect to possession of legal materials are moot.
 
 
 25
 In view of this decision, the motion for summary disposition, filed by the Department of Corrections defendants, and the motions "to deny summary judgment", filed by the appellant are moot.
 
 
 
 [1]
 The appellant does not state at what time he sustained his injury. It apparently was in the evening, however, since he states that he summoned the officer on duty "that night" to request that he be taken back to the HSU when he got no relief from the ice bag after one half hour
 
 
 [2]
 The complaint states the date as September 17, 1988. This is evidently a typographical error, as this filing, as well as the remainder of the appellant's filings, both in the district court and in this court, complain of a 7 day delay (i.e., September 9th to September 15th) before he was taken to the Shattuck Hospital
 
 
 [3]
 These named defendants and their titles as alleged by the appellant are: Ian Tink, Administrator at the Treatment Center; Thomas DaSilva, Director of Security at the Treatment Center; Edward Murphy, Commissioner of the Department of Mental Health; Michael V. Fair, Commissioner of the Department of Corrections; John Ober, Assistant Commissioner of Corrections Operations; and Officer John Doe, State Transportation Officer
 
 
 [4]
 The appellant's claim is based on the Eighth Amendment. The Fourteenth Amendment is relevant to appellant's claim only insofar as the Eighth Amendment is made applicable to the States by the Fourteenth. See appellant's brief at p. 10
 
 
 [5]
 The Department of Corrections defendants moved to dismiss, but John Ober, see note 3, was not included in that motion. At the time of this motion, Ober had not been served. On appeal, counsel for these defendants states that Ober was misidentified in the complaint. Similarly, State Transportation Officer John Doe was never further identified and served. In view of our determination that the dismissal of this complaint was correct as to all defendants, infra, the omission of these defendants from a motion to dismiss is of no moment
 
 
 [6]
 We also note that, in moving to dismiss, the Department of Corrections defendants submitted a copy of the Department's Inmate Transportation Policy regulations, 103 DOC 530, which provide, in pertinent part: "At no time during a transfer is an inmate to be in contact with, or have in his/her possession anything including--matches, cigarettes or legal papers. Such items shall be in the possession of the Transportation Officer in a large envelope", 103 DOC 530.07(5), and "All authorized medication shall be carried by the officer in charge. All dispending [sic] of medication during a transportation trip shall be handled by the officers and properly recorded.", 103 DOC 530.07(7)
 
 
 [7]
 We reiterate that, in fact, these defendants did file their motion. The only doubt arises as to whether the appellant received it. The question of receipt is irrelevant, however, because, in this case, the district court properly could have dismissed as to these defendants even if they had never filed their motion
 
 
 [8]
 The motion for appointment of counsel filed on May 5, 1989 was a rather perfunctorily-phrased request. It did not mention the motions to dismiss and cannot be construed as an objection
 
 
 [9]
 We, therefore, reject appellant's claim that he should have been allowed discovery
 
 
 [10]
 The appellant escaped from the Treatment Center on October 1, 1989. As a result, all of his property was searched for evidence relative to the escape and some of it was confiscated. He was recaptured on October 4, 1989 and transferred for a period of time to Massachusetts Correctional Institute at Cedar Junction. According to the affidavit of the officer in charge of the investigation into the escape, to the officer's knowledge, appellant's legal materials remained at the Treatment Center "for inventory and processing." Appellant was returned to the Treatment Center in April 1990 and his legal papers were returned to him in May 1990
 On October 23, 1989, while at Cedar Junction and shortly after his recapture, the appellant moved for reconsideration of the denial of appointment of counsel, stating that he was without his legal papers and that he had not known what to do in response to the previously-filed motions to dismiss. Whatever sympathy we ordinarily might have for this lack of access to legal papers is tempered by the appellant's role in creating this plight. Moreover, we note that the motions to dismiss were filed in April and May 1989, and the original request for appointed counsel was denied in July 1989, well prior to October 1st, while appellant was still at the Treatment Center and in possession of his legal materials. Nothing in the motion for reconsideration changes our determination, supra, at 15, that there was no abuse of discretion in the denial of appointed counsel.